NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
: 
RONALD P. ZELLIN and FLORENCE J., :
ZELLIN, :
   :
       Plaintiffs, :   Civil Action No. 03-4943 (JAP)
   :
   v. :
   :   **OPINION**
MOUNT SINAI HOSPITAL, a New York :
Non-Profit Corporation, MOUNT SINAI :
RETIREMENT HEALTH AND :
WELFARE PLAN, JOHN DURAN and :
JOHN DOES 1-5, fictitious defendants, :
   :
       Defendants. :
_____:

APPEARANCES

ROBERT H. JAFFE & ASSOCIATES, P.A.
Robert H. Jaffe
Mark B. Watson
8 Mountain Avenue
Springfield, NJ 07081
    Attorneys for Plaintiffs

PROSKAUER ROSE LLP
Edward Cerasia II
Marguerite Stenson Wynne
One Newark Center, 18th Floor
Newark, NJ 07102
    Attorneys for Defendants Mount Sinai Hospital and Mount Sinai Retirement Health and
    Welfare Plan

PISANO, District Judge.

Ronald Zellin ("Zellin") and his wife, Florence (collectively "Plaintiffs") filed a two-count Complaint with this Court on October 17, 2003, alleging that Mount Sinai Hospital ("Hospital"), Mount Sinai Retirement Health and Welfare Plan ("Plan") (collectively "Defendants"), and John Duran ("Duran"),[1] as Plan Administrator, violated their rights under Sections 502(a)(1)(B) and 502(c)(A) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and 1132(c)(A).[2]  Defendants now move for summary judgment pursuant to Rule 56©) of the Federal Rules of Civil Procedure ("FRCP").  This Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132.  For the reasons expressed below, the Court grants Defendants' motion for summary judgment.

**I. Factual History**

Zellin, who was employed by the Hospital from 1972 until August 3, 1999 when he retired voluntarily, enrolled himself and his wife in the Plan upon retirement.  (Plaintiffs' Admitted Responses to Defendants' Statement of Material Facts ("Plaintiffs' Admissions") ¶¶ 2, 14).  The Plan is an employee welfare plan under ERISA that provides certain medical benefits to eligible Hospital retirees and their eligible spouses and dependants.  (Plaintiffs' Admissions ¶ 3). On January 1, 1992, the Hospital's Board of Trustees ("Board") implemented the Mount Sinai

---

[1] Defendant John Duran has not appeared and Plaintiffs secured a Clerk's entry of default against John Duran on September 8, 2004.

[2] Plaintiffs cite "Section 502(c)(A) of ERISA" as "29 U.S.C. § 1132(c)(A)" but the proper cite would be 29 U.S.C. § 1132(c)(1)(A).  Nonetheless, that too appears incorrect based on the language of the Complaint which seeks relief under 29 U.S.C. § 1132(c)(1)(B).  Plaintiffs' claim in their Second Count will be addressed as if brought under 29 U.S.C. § 1132(c)(1)(B).

Medical Center Retirement Program as the Plan's operating document. (*See* Exhibit 9 to Deposition of Shirley Alban ("Alban Dep")). The health and welfare benefits adopted as the Plan were summarized in a pamphlet entitled "The Mount Sinai Medical Center Retirement Plan," ("Summary Plan Description" or "SPD") for distribution to those enrolled in the Plan. (*See* Exhibit 8 to Alban Dep). Revised SPDs have issued periodically to Plan participants, including Plaintiffs. (Plaintiffs' Admissions ¶ 5).

Under the terms of the Plan, "[t]he actual cost for health coverage is covered by the employee and the [Hospital]." (Plaintiffs' Admissions ¶ 6, quoting p.5 of the Plan, Exhibit 9 to Alban Dep). The Hospital pays a Defined Dollar Benefit ("DDB"), which "is a fixed dollar amount the [Hospital] contributes towards the actual cost of hospital, major medical and drug coverage." (*Id.*, quoting p.6 of the Plan, Exhibit 9 to Alban Dep). The Hospital "defines, on a yearly basis, the level of this contribution. Future increases in health care costs are absorbed by the retiree," *id.*; more specifically, the DDB would remain constant and all future increases in costs for retiree healthcare would be passed directly to the retirees. (Plaintiffs' Admissions ¶ 10, citing p.6 of the Plan, Exhibit 9 to Alban Dep). The Hospital's "DDB contribution for the retiree is the 1992 actual cost, or [$] 3,203 if under 65 and [$] 1,770 if 65 or older." (Plaintiffs' Admissions ¶ 6, quoting p.5 of the Plan, Exhibit 9 to Alban Dep). The Hospital's "DDB contribution for the spouse of [a] retiree is 75% of the 1992 actual cost." (*Id.*)

The Plan provides that the retiree's age at the time of retirement plus the years of his service with the Hospital is used to determine the percentage that the retiree is required to contribute towards his and his spouse's medical insurance coverage. (Plaintiffs' Admissions ¶ 7, citing p.6 of the Plan, Exhibit 9 to Alban Dep). Under the Plan, the Hospital "reserves the right

3

to eliminate or change the coverage with respect to cost sharing and/or level of benefits." (Plaintiffs' Admissions ¶8, quoting p.6 of the Plan, Exhibit 9 to Alban Dep).  The Plan also included a "Grandfathered Clause," which provided that "[i]n recognition of tenure at the [Hospital], years of service are grandfathered.  Eligible employees who have completed 25 or more years of service through December 31, 1991 may retire as early as age 55, Executives may retire at any age, but under the terms of DDB Plan in effect on July 1, 1990."  (*See* p.6 of the Plan, Exhibit 9 to Alban Dep).

Although healthcare costs were increasing from 1992, when the Plan was initiated, until 2002, the DDB covered the cost of healthcare benefits for the Hospital's post-1991 retirees age 65 and over; therefore, those retirees were not required to pay a retiree premium during that time. (Plaintiffs' Admissions ¶ 11).  In 2002, however, healthcare costs increased above the DDB. (Plaintiffs' Admissions ¶ 12).  In accordance with the Plan's provision that the DDB remain constant and all increases be passed to the retirees, in January 2002 the Hospital notified its post-1991 retirees that they would be required to contribute or increase their contributions starting in March 2002.  (*Id.*)  Specifically, those employees who were 65 and over, with at least 82 accrued retiree points and had retired on or after January 1, 1992, were informed of their responsibility to pay a retiree premium.  (Plaintiffs' Admissions ¶ 17).  Zellin, being over 65 and having accrued 89 retiree points, and having retired in August 1999, received the January 2002 notice of the increase in the cost of Plan benefits.   (Plaintiffs' Admissions ¶¶ 15, 18).  Plaintiffs learned that as of March 1, 2002, they would be required to pay an annual premium for Zellin's Plan benefits and an increased premium for his wife's Plan benefits.  (Plaintiffs' Admissions ¶ 19).

After receiving the January 2002 notice, Zellin contacted the Hospital's Human

4

Resources Department and spoke with Shirley Herdoiza Alban ("Alban"). (Plaintiffs' Admissions ¶ 20). Alban told Zellin that, due to recent increases in the cost of retiree healthcare coverage, he would have to start paying a retiree premium and an increased premium for his wife's coverage. (Plaintiffs' Admissions ¶ 21). Zellin was dissatisfied with Alban's explanation and visited the office of the United States Department of Labor ("DOL") in New York to inquire about the changes to the Plan. (Plaintiffs' Admissions ¶ 22). Zellin met with Dorothy J. Bryant ("Bryant"), a DOL representative responsible for responding to people who inquire about their employment benefits. (Plaintiffs' Admissions ¶ 23). Zellin told Bryant that he had retired from the Hospital on August 3, 1999, and he wanted to know why he and his spouse were required to pay additional premiums for the Plan benefits. (Plaintiffs' Admissions ¶ 24). Bryant then called Alban, who explained the reasons for the increase in Plan premiums and agreed to follow up with a written explanation. (Plaintiffs' Admissions ¶¶ 25-27). Alban faxed correspondence and Plan documents to Bryant on June 28, 2002. (Plaintiffs' Admissions ¶ 28). Bryant mailed a copy of Alban's letter to Zellin, which Zellin claims he received without any accompanying documents. (Plaintiffs' Admissions ¶¶ 31, 32; Zellin Dep at 54-56).

Alban sent Zellin a letter, dated September 13, 2002, further explaining the reason for the increase in the premiums and informing Plaintiffs they could call Alban if they had any further questions; Plaintiffs, however, did not call Alban. (Plaintiffs' Admissions ¶¶ 33, 34). Bryant, together with Alban and Paula Mednick ("Mednick"), Alban's supervisor, called Zellin on November 5, 2002. (Plaintiffs' Admissions ¶ 35). Zellin refused to speak with Bryant, Alban, and Mednick and informed them that he was represented by counsel and that they should direct

all further correspondence/conversations to his counsel.[3] (Plaintiffs' Admissions ¶ 35). Alban then received a letter from Zellin dated November 4, 2002, demanding copies of all Plan documents, to which Alban did not respond. (Plaintiffs' Admissions ¶¶ 37, 39). Plaintiffs' counsel then sent another letter making the same request, dated February 3, 2003, to which Alban did not respond. (Plaintiffs' Admissions ¶¶ 38, 39).[4]

## II. Summary Judgment Standard

A court shall grant summary judgment under FRCP 56©) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party

---

[3]Although Defendants contend that Zellin requested the conference call and Plaintiffs assert he did not, the dispute is immaterial to the issues before the Court.

[4]Defendants contend that because Alban referred Zellin's November 4, 2002 letter to Mednick and received counsel's letter from her former manager, Duran, she reasonably believed that she was not personally responsible for responding to the requests. Plaintiffs do not dispute Defendants' description of Alban's involvement with the document requests; rather, Plaintiffs argue simply that Alban or Defendants received the letters and failed to respond. (Plaintiffs' Admissions ¶¶ 37-39). As Plaintiffs have not disputed Defendants' version of the events they are accepted as stated and the letters are considered to have been received and unanswered. Any difference that remains is immaterial.

makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party may not simply rest on its pleadings, but must offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, a genuine issue for trial does not exist unless the non-moving party proffers evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**III. Discussion**

 **A. Increased Costs**

In the First Count of their Complaint, Plaintiffs invoke Section 502(a)(1)(B) of ERISA, which permits a participant in an ERISA plan to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see* Complaint, ¶ 28. Zellin claims he believed that upon retirement the cost of his healthcare coverage "would

be paid by the Plan" and the coverage for his wife would be "for a substantially reduced premium." Complaint, ¶ 30. As a result, Plaintiffs allege that "[t]he attempt by the defendants to increase the cost of healthcare both to Plaintiffs Ronald P. Zellin and to Florence J. Zellin . . . constitutes a breach of contractual obligations owed and/or a violation of fiduciary obligations owed to plan participants by the Plan Administrators." Complaint, ¶ 32.

In their motion for summary judgment, Defendants assert that when the Board adopted the Plan in 1992 it specifically reserved the Hospital's "right to increase premiums . . . [when it decided] that all future increases in healthcare costs would be passed on directly to retirees." (Defendants' Brief, p.8-9). Defendants point to Plaintiffs' admissions that the Plan defines the DDB as the Hospital's level of contribution and declares that any "[f]uture increases in health care costs are absorbed by the retiree." (Plaintiffs' Admissions ¶¶ 5-6, quoting p.6 of the Plan, Exhibit 9 to Alban Dep). Defendants emphasize that Plaintiffs admittedly understood the DDB would remain constant and all future increases in costs for retiree healthcare would be passed directly to the retirees. (Plaintiffs' Admissions ¶ 10, citing p.6 of the Plan, Exhibit 9 to Alban Dep). Essentially, Defendants argue that there was no change, amendment, or modification to the Plan because the increase provision has always been part of the Plan and Plaintiffs were aware of it. (Defendants' Reply Brief, p.5 ).

Plaintiffs, in opposition to Defendants' motion, claim that the "Grandfathered Clause" and other written documents exempt certain employees from paying increases above the DDB. (Plaintiffs' Brief, p.4-5). However, Plaintiffs fail to point to any specific exemption provisions, claiming only that Defendants have failed to provide the "other written documents" in which the provisions can be found. Plaintiffs also argue that the increase in premium payments is an

amendment to the Plan and that such amendment was not made pursuant to the "Amendment Procedure." (Plaintiffs' Brief, p.5-7). Plaintiffs point to a provision in the 2002 SPD, which describes that any amendment, modification or termination of Plan benefits must be recommended by the Benefits Department, reviewed by Human Resources Management, and approved by the Board. (Plaintiffs' Brief, p.6). These arguments, however, attempt to confound a straightforward set of circumstances.

The Board determined, through its adoption and implementation of the Plan, that the Hospital would contribute and pay all costs up to the DDB. As long as the costs were below the DDB, which would remain constant, the retirees would not have to contribute. Once healthcare costs rose above the DDB, the increase would be passed to the retirees. Plaintiffs admitted that they understood these provisions. (Plaintiffs' Admissions ¶ 10, citing p.6 of the Plan, Exhibit 9 to Alban Dep). Plaintiffs' attempt to frame the passing on of costs as an amendment to the Plan is untenable. First, Plaintiffs cannot rely on the "Grandfathered Clause" because it only applies to those employees who had completed 25 or more years of service through December 31, 1991. Zellin, who began working for the Hospital in 1972, had only completed nineteen years by the end of 1991. Second, Plaintiffs cannot rely on the unspecified exemption provisions of "other written documents" to overcome summary judgment. *See Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998) ('[T]he nonmoving party must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'") (citation omitted). Lastly, Plaintiffs' "Amendment Procedure" is inapposite in this context because there was no amendment or modification of the Plan. The Board approved the increase provision when it adopted the Plan in 1992; accordingly, any subsequent approval would have been

9

superfluous and unnecessary. Because Plaintiffs knew the Board had provided for the possibility of an increase in fees, there is no genuine issue of material fact and the Court grants summary judgment for Defendants.

### B. Document Requests

In the Second Count of their Complaint, Plaintiffs invoke 29 U.S.C. § 1132(c)(1)(B)[5] which indicates that any administrator "who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." *See* Complaint, ¶ 36. Plaintiffs claim that "the Plan Administrator has failed to supply . . . copies of the Plan, any amendments thereto, Summary Plan Descriptions and other documents pertaining to the Plan which were in effect in August 1999 although the plaintiffs have twice requested copies of these documents . . . ." Complaint, ¶ 35. According to the Complaint, "defendant Duran is the Plan Administrator of the Plan." Complaint, ¶ 7. Based on their claim against the Plan Administrator, i.e., Duran, Plaintiffs "demand judgment against the defendants, jointly and severally," for a fine of $100 per day since November 7, 2002.

---

[5]As explained in note 2, Plaintiffs cite "Section 502(c)(A) of ERISA" as "29 U.S.C. § 1132(c)(A)" but the proper cite would be 29 U.S.C. § 1132(c)(1)(A). Nonetheless, that too appears incorrect based on the language of the Complaint which seeks relief under 29 U.S.C. § 1132(c)(1)(B). Plaintiffs' claim in their Second Count will be addressed as if brought under 29 U.S.C. § 1132(c)(1)(B).

Complaint, ¶ 36.

In their motion for summary judgment, Defendants assert that any imposition of civil penalties under 29 U.S.C. § 1132(c)(1) is discretionary and in order for the Court to exercise that discretion adversely against Defendants, the Plaintiffs must demonstrate that Defendants acted intentionally or in bad faith and that Plaintiffs were prejudiced. (Defendants' Brief, p.11-13). Plaintiffs oppose the motion by contending that Defendants ignored their document requests and thus they suffered prejudice in the form of distress and frustration. (Plaintiffs' Brief, p.11). Both sides cite *Romero v. SmithKline Beecham*, 309 F.3d 113 (3d Cir. 2002), for the discretionary factors that a court should consider. (Defendants' Brief, p.12; Plaintiffs' Brief, p.11). The Third Circuit explained that "[a]ppropriate factors to be considered in making these decisions [under 29 U.S.C. § 1132(c)(1)] include 'bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary.'" *Id.* at 120 (citation omitted). The court also noted that "[o]ther circuits have studied the role of prejudice or damages in the inquiry and have concluded that although they are often factors, neither is a *sine qua non* to a valid claim under section 502(c)(1)." *Id.* Defendants also cite *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134 (3d Cir. 1987), *aff'd in part, rev'd in part on other grounds*, 489 U.S. 101 (1989), in support of its argument that the Court should deny Plaintiffs' request for penalties. The Third Circuit stated:

> Section 502©) grants significant discretion to the district court to decide whether to award damages under that provision. We think that that discretion can be used, for example by granting summary judgment in appropriate cases, to prevent strategic behavior by plaintiffs seeking to take unfair advantage of § 502(c)'s damage provisions when they are not entitled to any ERISA benefits. For

11

> example, if the employee's claim for benefits is not colorable, and if the employer displayed no bad faith in responding to the claim – taking somewhat too long to respond to it, for instance, but not ignoring it entirely – then the district court would be well within its discretion in setting damages at $0.

*Id.* at 153.

Before addressing the parties' arguments, it is necessary to point out a discrepancy. Plaintiffs' Second Count is brought specifically and solely against defendant Duran as the Plan Administrator, though it seeks judgment from all defendants. Section 1132(c)(1) only permits civil penalties for violations by the administrator and advises that the administrator "may in the court's discretion be *personally* liable." (emphasis added). Thus, there appears to be no cause of action against Defendants as the corporate entities and Plaintiffs have already secured an entry of default against Duran who has not appeared. However, neither Defendants nor Plaintiffs have addressed this problem. Therefore, the Court will proceed to the merits as if Defendants were subject to 29 U.S.C. 1132(c)(1).

Plaintiffs claim that Zellin sent a document request to Alban, dated November 4, 2002, that was received after the November 5, 2002 phone call in which Zellin instructed Alban not to correspond with him but with his counsel. Alban forwarded the request to her supervisor, Mednick, and the request went unanswered. Next, Plaintiffs claim their counsel sent a request to Alban, dated February 3, 2003, though Alban stated she received the letter from Duran. Believing that her supervisors, Mednick and Duran, were aware of the requests and having already submitted the materials to Bryant at the DOL, Alban did not respond.[6] Plaintiffs now ask the Court to impose penalties on Defendants based on the conduct of Alban, the only person to

---

[6]As explained in note 4, Plaintiffs do not dispute Defendants' factual allegations regarding Alban's involvement with the document requests.

whom they sent document requests.

Plaintiffs have not demonstrated that Alban, or anyone else, acted in bad faith or with the intent to deprive Plaintiffs of Plan documents. Plaintiffs made two requests that Alban reasonably believed were not her responsibility to handle. Rather than claiming that Defendants failed to respond for "502 days," (Plaintiffs' brief, p.10), Plaintiffs could have ascertained whether Alban was the person to whom they should be sending such requests. Moreover, though Defendants may have been dilatory in responding to Plaintiffs' requests, the requests were not ignored as Alban sent the documents to Bryant at the DOL. Even assuming Plaintiffs were diligent in making their two requests that went unanswered, they have not demonstrated circumstances that would warrant imposition of civil penalties. Therefore, in exercising its discretion under 29 U.S.C. § 1132(c)(1), the Court declines to impose a civil penalty against Defendants and grants summary judgment in favor of Defendants.

**IV. Conclusion**

For the reasons expressed above, Defendants' motion for summary judgment is granted.

s/ Joel A. Pisano<br>JOEL A. PISANO, U.S.D.J.

Dated: May 31, 2005